UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
|        Petitioner, | ) ) | CIVIL ACTION NO. 13-13054-DPW |
|    v. | ) ) | |
| RICHARD SILKMAN, and COMPETITIVE ENERGY SERVICES, LLC, | ) ) ) | |
|        Respondents. | ) | |

and related matter

| | | |
|---|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
|        Petitioner, | ) ) | CIVIL ACTION NO. 13-13056-DPW |
|    v. | ) ) | |
| LINCOLN PAPER AND TISSUE, LLC, | ) ) | |
|        Respondent. | ) | |

MEMORANDUM AND ORDER REGARDING MOTIONS TO DISMISS
April 11, 2016

Two petitions by the Federal Energy Commission ("FERC") seeking affirmance of two of its orders assessing civil penalties have been pending before me.  One petition (Case No. 13-cv-13056) seeks affirmance of a civil penalty against Lincoln Paper and Tissue Company ("Lincoln").  The second (Case No. 13-cv-13054) seeks affirmance of a civil penalty against Richard Silkman and Competitive Energy Services, LLC ("CES").  Both

1

penalties relate to participation by the respondents in the
"Day-Ahead Load Response Program" ("DALRP"), a program
administered by ISO New England ("ISO-NE"), a delegate of FERC,
which is designed to provide energy users with an incentive to
reduce their electrical usage during times of increased demand
and higher prices.

The respondents seek to have the cases dismissed in motion
practice turning on the pleadings.  I have kept the motions
under advisement pending a Supreme Court decision that would be
dispositive of the jurisdictional issue in this case.
Meanwhile, the respondent Lincoln filed for bankruptcy.  Now
that the Supreme Court has provided guidance and the Maine
Bankruptcy Court has stated that the enforcement dimension to
the Lincoln case is not subject to the automatic stay, I act
through this Memorandum to deny the respondents' motions.  In a
separate Memorandum and Order issued today, I will transfer the
cases to the United States District Court for the District of
Maine for further proceedings.

## I. BACKGROUND

### A.   *Relevant Entities*

Petitioner FERC is an administrative agency of the United
States, organized pursuant to the Federal Power Act, 16 U.S.C.

§ 791a, *et seq.*  Lincoln Compl. ¶ 13.[1]

Respondent Lincoln is a limited liability company organized under the laws of Maine with a principal place of business in Maine.  Lincoln Compl. ¶ 13.

Respondent CES is a limited liability company organized under the laws of Maine with a principal place of business in Maine.  Silkman Compl. ¶ 15.  Respondent Silkman is an employee and managing member of CES.  Silkman Compl. ¶ 14.

ISO-NE is an independent, non-profit, Regional Transmission Organization ("RTO") tasked with ensuring the day-to-day reliable operation of New England's bulk electric energy generation and transmission system.  Lincoln Compl. ¶ 2.

**B.    *The Day-Ahead Load Response Program***

As part of its operations, ISO-NE administers load response programs that encourage large electric energy users to reduce their consumption or electric "load" during periods when the bulk electric system is experiencing peak demand.  The reduction in peak demand reduces stress on the electric grid and can also serve to reduce electricity prices.  Lincoln Compl. ¶ 3.  The

---

[1] "Lincoln Compl." refers to the petition filed in Case No. 13-cv-13056.  "Silkman Compl." refers to the petition filed in Case No. 13-cv-13054.  With respect to their descriptions of the activities of ISO-NE and the administration of the DALRP, the two petitions appear substantively identical.

3

specific program at issue in this matter is the Day-Ahead Load
Response Program ("DALRP").  As FERC describes the DALRP,
participants bid to reduce their energy consumption below their
normal usage rate.  If their bid was accepted, the participant
would be compensated for the reduction in their electricity
consumption below normal levels.  Lincoln Compl. ¶¶ 26, 30.  *See
also FERC* v. *Elec. Power Supply Ass'n*, No. 14-840, 2016 WL
280888 (U.S. Jan. 25, 2016) (describing demand response programs
like the DALRP).

In order to calculate the reduction in a DALRP
participant's electricity consumption, ISO-NE must establish a
baseline level of electricity consumption.  To do so, ISO-NE
measures the average of the participant's use of electricity
from the grid in the hours from 7:00 am through 6:00 pm during
the five days following the participant's approval for
participation in DALRP, but before the entity begins reducing
its demand under DALRP.  The demand reduction is calculated from
this baseline by subtracting the actual electrical consumption
from the grid during the hours in which ISO-NE has accepted the
participant's bid.  Lincoln Compl. ¶¶ 27-28.[2]

---

[2] I set forth the mechanics of the DALRP, including the setting
of the DALRP baseline, as they are described by FERC in its
petitions, recognizing that Lincoln contends that FERC failed to

After the initial baseline consumption level is established, it is not left static.  Rather, it is updated on a rolling basis to reflect a participant's actual load data on days when the participant either did not bid to participate in DALRP or its bid was not accepted by ISO-NE.  Lincoln Compl. ¶ 29.  According to FERC, this adjustment is intended to reflect any changes in a participant's normal operations to ensure that a participant is not compensated for reductions in electrical consumption that would have occurred absent the incentives provided by DALRP.  Lincoln Compl. ¶ 28.  Because the rolling baseline is intended to measure the participant's electricity consumption absent participation in DALRP, the rolling average baseline consumption calculation excludes days in which a participant's bid into DALRP was accepted.  Lincoln Compl. ¶ 29. Because of this exclusion, if a participant bid into DALRP every day, and its bid was accepted on each day, its baseline load figure would remain unchanged.  Lincoln Compl. ¶ 30.  A participant bids into DALRP by evaluating whether it could reduce its load on the next day and, if so, offering to reduce its consumption by a certain number of kilowatts or megawatts

---

specify how participants were expected to set their baselines. Lincoln's contentions regarding this issue are discussed below.

("MWh") per hour during the peak period at a certain price--
between $50/MWh and $1,000/MWh.  *Id.*

### C.  *Lincoln's Participation in DALRP*

Lincoln is a paper mill in Lincoln, Maine with
approximately 400 employees.  In 2007, when fully operational,
Lincoln consumed approximately 20 MW of electricity without
appreciable fluctuation from day to night.  Lincoln obtained
electricity from two sources: (1) its own 4 MW steam-powered
turbine Westinghouse generator; and (2) purchasing approximately
16 MW of electrical energy from the grid.  Lincoln Compl. ¶¶ 33,
34.

Lincoln enrolled in the DALRP in July 2007.  Lincoln Compl.
¶ 35.  The initial baseline for Lincoln's electricity
consumption was calculated based on its electric energy
purchases on July 25, 26, 27, 30, and 31, 2007 between the hours
of 7:00 a.m. and 6:00 p.m.  Lincoln Compl. ¶ 37.

On those days, Lincoln curtailed the use of its on-site
generator, reducing output from 4 MW to 1 MW from 7:00 a.m. to
6:00 p.m.  As a result, instead of purchasing 16 MW from the
grid and obtaining the remaining 4 MW from its on-site generator
(its typical consumption pattern), Lincoln obtained 19 MW from
the grid.  Lincoln Compl. ¶ 38.  Thus, Lincoln's baseline

electrical draw from the grid was higher than its typical electrical purchases for its ongoing operations.

As a result of curtailing its use of the on-site generator during the baseline setting period, Lincoln was required to purchase $10,000.00 of additional electrical energy from the grid, despite being able to generate electricity on-site at lower cost.  Lincoln Compl. ¶ 39.

Having created an inflated baseline level of electrical consumption, Lincoln next took actions to freeze its baseline at this inflated level.  Lincoln Compl. ¶ 41.  To accomplish this, it consistently offered the minimum bid price for reducing its electrical consumption from the grid, thereby ensuring that its bids would almost always be accepted and the rolling baseline would not reset to reflect Lincoln's typical electrical consumption pattern.  Lincoln Compl. ¶ 42.  Lincoln employed a third party, Constellation NewEnergy, Inc., as its DALRP enrolling agent.  In July and August of 2007, Lincoln verified with Constellation that this strategy would have the result of freezing its baseline at the inflated level.  Lincoln Compl. ¶ 43.

As anticipated by Lincoln, its bids were accepted nearly every day and, as a result, Lincoln's baseline was not updated to reflect the normal use of the on-site generator.  The only

occasions in which Lincoln's offers failed to clear the bidding process were when Lincoln made an error such as failing to submit an offer by the daily deadline.   Lincoln Compl. ¶ 44.

Lincoln obtained revenues from the DALRP for almost every day it participated between August 1, 2007 and February 7, 2008. Lincoln Compl. ¶ 45.   On the days and months that Lincoln participated in the DALRP, Lincoln ran its on-site generator at normal capacity.   Lincoln Compl. ¶ 46.   Thus, Lincoln did not reduce its electrical consumption from the grid below its typical consumption pattern, although it reduced its consumption from the grid as compared to the baseline period.

In November and December 2007, Lincoln replaced the Westinghouse generator with a new generator with capacity of 13.5 MW and used the new generator to produce additional energy on-site.   Prior to installation, Lincoln notified Constellation that it planned on adding the new generator.   On November 29, 2007, Constellation advised Lincoln via email that Lincoln's baseline should be adjusted to reflect the greater on-site generation capacity and the reduction in normal energy consumption from the grid that would be necessary to support Lincoln's daily operations.   Lincoln Compl. ¶ 48.   On January 11, 2008, Constellation sent Lincoln a follow up email asking if the new generation unit was in operation and if Lincoln would

readjust its baseline.  Lincoln Compl. ¶ 49.  Lincoln did not
respond to either the November 29, 2007 or January 11, 2008
emails.

Instead, Lincoln brought the new generator on-line and
claimed the newly generated electricity as a reduction from
Lincoln's baseline level as part of its participation in the
DALRP.  Lincoln Compl. ¶ 50.  Because Lincoln offered daily bids
to participate in DALRP, the baseline remained frozen and did
not adjust to reflect the additional on-site generation capacity
that Lincoln employed for normal daily operations.  Lincoln
Compl. ¶ 47.

From July 2007 through February 2008, ISO-NE paid
$445,901.21 to Lincoln and Constellation for Lincoln's
participation in the DALRP.  Of those payments, Lincoln received
85 percent, or $379,016.03; Constellation retained the remaining
amount as compensation for its work as Lincoln's enrolling agent
in the DALRP.  Lincoln Compl. ¶ 52.  Approximately 40 percent of
these payments occurred in December and January, after Lincoln
had begun using the new generator to generate additional on-site
electricity.  Lincoln Compl. ¶ 51.

On July 23, 2008, Constellation sent Lincoln a letter
notifying Lincoln of Constellation's support for a new proposal
by ISO-NE which would modify the DALRP bidding rules and would

result in "customer's bids clearing less frequently and their baseline being adjusted more regularly."  Lincoln Compl. ¶ 53. Lincoln never responded to this letter.  Lincoln Compl. ¶ 54.

**D.   *CES's DALRP-Related Activities***

CES provides energy consulting and other services to clients throughout North America.  Silkman Compl. ¶ 35.  One client of CES and Mr. Silkman is Rumford Paper Company, a paper mill in Maine.  Silkman Compl. ¶ 36.

As a result of their work with Rumford, Mr. Silkman and CES knew that, although Rumford was connected to the electrical grid, it typically used a large and relatively inexpensive on-site generator to meet the substantial majority of its electricity needs.  Silkman Compl. ¶ 36.  In the spring of 2007, Mr. Silkman approached Rumford and suggested that the paper mill enroll in DALRP.  Silkman Compl. ¶ 37.

As part of this proposal, Mr. Silkman and another CES partner suggested that Rumford reduce the amount of electricity the mill generated with its on-site generator during the baseline setting period (similar to what Lincoln allegedly did) and purchase unusually large amounts of electricity from the grid — thereby inflating the DALRP baseline.  Mr. Silkman knew that this would be uneconomical in the short term for Rumford

because grid electricity was relatively more expensive than Rumford's on-site generation.  Silkman Compl. ¶ 42.

Mr. Silkman also understood that the scheme he proposed would not work unless Rumford's baseline continued to reflect the mill's abnormal curtailing of its on-site generator.  He realized the continued inflation of the baseline could be accomplished by designing daily bids to ISO-NE to participate in the DALRP in a manner such that the offers were almost always guaranteed to be accepted.  Mr. Silkman informed Rumford personnel that if the continuing bids were accepted, Rumford would receive payments under the DALRP for simply resuming routine operation of its on-site generator without reducing its electrical consumption from the grid.  Silkman Compl. ¶ 44.

Although Rumford managers expressed concern about the scheme to Mr. Silkman and CES, explaining that it appeared they would be paid for doing nothing, Rumford authorized CES to register Rumford in the DALRP and to facilitate the scheme.  Silkman Compl. ¶ 45.

CES, including Mr. Silkman, then daily communicated to ISO-NE Rumford's availability to provide approximately 20 MW of electricity reduction.  This phantom reduction was roughly equal to the amount by which Rumford curtailed its on-site generation during the baseline period.  Silkman Compl. ¶ 45.  CES continued

11

the scheme by making these offers at a price that effectively
guaranteed that each bid would be accepted, thereby assuring
that Rumford's baseline would remain unchanged.  Silkman Compl.
¶ 45.

The scheme designed by Mr. Silkman and CES continued from
late July 2007 through early February 2008.  During this time,
Rumford did not actually reduce its electrical consumption below
the levels of its routine business activities.  Silkman Compl. ¶
47.

In January 2008, ISO-NE made a presentation notifying
market participants that ISO-NE expected to make changes to the
program because it had learned that some market participants had
wrongly attempted to profit by intentionally establishing and
then maintaining an inflated baseline.  The presentation clearly
described precisely the scheme designed by Mr. Silkman and CES
and executed by them in conjunction with Rumford.  Mr. Silkman
was aware of the presentation and forwarded it to Rumford
managers.  Neither he nor anyone else at CES recommended that
Rumford cease its participation in the DALRP.  Silkman Compl. ¶
48.

Also in January 2008, Mr. Silkman received a phone call and
a letter from Constellation explaining its concerns that program
participants had artificially increased their electrical usage

during their baseline setting periods and warned that enrollees could be subject to sanctions if ISO-NE determined that the enrollee committed fraud to extract load response program payments.  Despite these communications, Mr. Silkman, CES, and Rumford continued their involvement in the DALRP as previously. Silkman Compl. ¶ 49.

During the period of Rumford's participation in the DALRP, ISO-NE paid $3,336,964.43 for load response that it contends did not occur.  Those payments were shared by CES and with Mr. Silkman as the owner of CES, along with Rumford and Constellation.  CES's share was $166,841.13, equal to 5% of the total.

## II. PROCEDURAL BACKGROUND

### A.   *FERC Proceedings Against Respondents*

#### 1.   The Investigation by FERC Enforcement

On February 8, 2008, ISO-NE changed the DALRP to ensure that schemes to inflate the baseline would not be profitable. After analyzing electrical usage data, ISO-NE suspected that Lincoln and Rumford, and perhaps related entities, had committed fraud and referred them to the Commission for possible enforcement action.  Lincoln Compl. ¶ 55; Silkman Compl. ¶ 50.

FERC's Office of Enforcement ("FERC Enforcement") commenced an investigation of Lincoln, CES, and Mr. Silkman in February

13

2008, obtaining and reviewing thousands of pages of documents including electrical consumption data, load response offer data, and internal emails and memoranda.  FERC Enforcement also took the depositions of various witnesses, including employees of the Respondents and third-parties.  Lincoln Compl. ¶ 58; Silkman Compl. ¶ 52.

Based upon this investigation, FERC Enforcement determined that Lincoln had devised and implemented a scheme to inflate the baseline electrical consumption figure used for its participation in DALRP and by doing so, violated FERC's Anti-Manipulation Rule (discussed below).  Lincoln Compl. ¶ 58.  FERC Enforcement determined that CES and Mr. Silkman had violated the same rule based upon the role they played in Rumford's similar scheme.  Silkman Compl. ¶ 53.

FERC Enforcement issued letters notifying Respondents of its intent to seek action by the Commission to which Respondents provided detailed responses.  FERC Enforcement provided Respondents' responses, along with earlier correspondence, to the Commission.  Lincoln Compl. ¶ 60; Silkman Compl. ¶ 54. Pursuant to Commission procedures, FERC Enforcement also provided its staff report and recommendation to the Commission. In the report, Enforcement detailed its findings and recommended

that the Commission issue Orders to Show Cause to Lincoln, CES, and Mr. Silkman.   Lincoln Compl. ¶ 61; Silkman Compl. ¶ 55.

## 2.   Issuance of Orders to Show Cause

On July 17, 2012, the Commission issued an Order to Show Cause to Lincoln, attaching the Enforcement Staff Report, in which the Commission required Lincoln to show cause as to why it should not be found: (1) to have violated FPA Section 222, 16 U.S.C. § 824v, and FERC's Anti-Manipulation Rule; (2) be assessed a civil penalty of $4,400,000.00; and (3) be required to disgorge $379,016.03 in unjust profits.   Lincoln Compl. ¶ 62.

That same day, the Commission issued Orders to Show Cause to CES and Mr. Silkman, in which the Commission required CES and Mr. Silkman to show cause as to why: (1) they should not be found to have violated FPA Section 222, 16 U.S.C. § 824v, and FERC's Anti-Manipulation Rule; (2) Mr. Silkman should not be assessed a civil penalty of $1,250,000.00; (3) CES should not be assessed a civil penalty of $7,500,000.00; and (4) CES should not to be required to disgorge $166,841.13 in unjust profits. Silkman Compl. ¶ 55.[3]

---

[3] Separately, FERC Enforcement reached a settlement agreement with Rumford related to its participation in the DALRP.

In the Orders to Show Cause, the Commission explained that the Show Cause Order also constituted a notice of a proposed penalty, as required by Section 31 of the FPA, 16 U.S.C. § 823b(d).  Respondents were required to elect either an administrative hearing before an Administrative Law Judge pursuant to FPA Section 31(d)(2), 16 U.S.C. § 823b(d)(2), or, alternatively, an immediate penalty assessment by the Commission under FPA Section 31(d)(3)(A), 16 U.S.C. § 823b(d)(3)(A).  FERC explained in its notice to Lincoln:

> If Respondent elects an administrative hearing before an ALJ, the Commission will issue a hearing order; if Respondent elects an immediate penalty assessment, and if the Commission finds a violation, the Commission will issue an order assessing a penalty. If such penalty is not paid within 60 days of assessment, the Commission will commence an action in a United States district court for an order affirming the penalty, in which the district court may review the assessment of the civil penalty *de novo.*

Lincoln Compl. Ex. 2 at 2. (FERC Order to Show Cause and Notice of Proposed Penalty, July 17, 2012) citing FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B).

CES and Mr. Silkman elected the procedures of FPA Section 31(d)(3)(B) on July 27, 2012.  Silkman ¶ Compl. 56.  Lincoln on did the same August 14, 2012.  Lincoln Compl. ¶ 63.

16

On September 14, 2012, the Respondents submitted answers to the Show Cause Orders, to which FERC Enforcement filed replies. Lincoln Compl. ¶ 64; Silkman Compl. ¶ 58.

### 3.    FERC's Assessment of Civil Penalties

After reviewing the briefs and evidentiary record on the Show Cause Orders, the Commission issued orders on August 29, 2013 assessing civil penalties against Lincoln, CES, and Mr. Silkman.

The Commission found that Lincoln violated FPA Section 222 and the Anti-Manipulation Rule by inflating and then maintaining a fraudulently inflated baseline in order to receive payments for reductions in electrical consumption that Lincoln had not actually provided.  Lincoln Compl. ¶ 66.  The Commission found that Lincoln's actions defrauded ISO-NE at the expense of ratepayers throughout New England and caused electricity consumers in New England to pay $445,901.21 for demand response that never occurred.  Lincoln Compl. ¶ 74.

The Commission determined that Lincoln engaged in these acts knowingly, as demonstrated by Lincoln's intentional curtailment of the operation of its on-site generator during the baseline setting period and by its submission of demand response bids on almost every hour of every day during the time of its participation in the DALRP.  Lincoln's decision to purchase

17

$10,000 of grid electricity rather than generating that electricity using its own generator during the time that the baseline was set demonstrated an intention to defraud ISO-NE. Otherwise, there would have been no reason to expend the $10,000: on-site generation was a more cost effective alternative.   Lincoln Compl. ¶¶ 76, 77.

The Commission determined that the violations by Lincoln were tolerated by senior level management and also determined that Lincoln did not cooperate with FERC's investigation and provided delayed and incomplete responses to requests for information.   Due to Lincoln's lack of cooperation, the Commission increased the recommended penalty of $4,400,000 by an additional $600,000, assessing a total penalty of $5,000,000. Lincoln Compl. ¶¶ 66-68.

The Commission likewise found that CES and Mr. Silkman violated FPA Section 222 and the Anti-Manipulation Rule.  It determined that they had devised and executed a scheme to inflate and then maintain a fraudulently inflated baseline in order for Rumford to receive payments (shared with CES and Mr. Silkman) for reductions in electrical consumption that Rumford had not actually provided.   Silkman Compl. ¶ 60.   The Commission also found that CES submitted registration information to ISO-NE which fraudulently represented Rumford's load reduction

18

capacity.   Silkman Compl. ¶ 67.   Additionally, the Commission found that Mr. Silkman and CES acted with scienter, as reflected by the fact that Mr. Silkman proposed a plan to Rumford which was designed to inflate and then freeze Rumford's DALRP baseline.   Silkman Compl. ¶ 71-73.   The Commission issued orders assessing the penalties recommended by FERC Enforcement. Silkman Compl. ¶ 66.

Finally, the Commission determined that Respondents' fraudulent schemes were within the Commission's jurisdiction. Lincoln Compl. ¶¶ 80, 81; Silkman Compl. ¶ 74-76.

## B.   *Federal Court Proceedings*

Lincoln, CES, and Mr. Silkman failed to pay the penalties assessed against them and so, pursuant to Section 31(d) of the FPA, 16 U.S.C § 823b, the Commission filed petitions with this court seeking affirmance of its Civil Penalty Orders against the Respondents.

CES and Mr. Silkman filed a motion to dismiss on December 19, 2013.   Lincoln did the same on February 14, 2014.   CES and Mr. Silkman refined their arguments for dismissal by filing a motion for judgment on the pleadings.   I kept these dispositive motions under advisement pending the resolution of the fundamental jurisdictional issue present here.   The Supreme Court rendered its decision on that issue earlier this year.

*FERC* v. *Elec. Power Supply Ass'n*, No. 14-840, 2016 WL 280888
(U.S. Jan. 25, 2016).

Meanwhile, Lincoln had voluntarily filed for bankruptcy.
*In re Lincoln Paper and Tissue, LLC*, No. 15-10715 (Bankr. D. Me.
September 28, 2013).  Last week, the Bankruptcy Court ruled, *id.*
(Dkt. No. 495) (Bankr. D. Me. Apr. 5, 2016) that the automatic
stay did not apply to the enforcement dimension of the action
against Lincoln.[4]

---

[4] In his oral opinion from the bench in the bankruptcy action,
Judge Cary offered alternative grounds for treating the
automatic bankruptcy stay as inapplicable to this case.  First,
he concluded the stay was inapplicable because the police
regulatory power exceptions to an automatic stay provide
statutory relief.  Second, he concluded that he could grant
judicial relief to "allow FERC to continue forward in the
Massachusetts District Court enforcement actions."  *In re
Lincoln Paper and Tissue, LLC*, No. 15-1075 (Bankr. D. Me. Apr.
5, 2016) (Tr. At 7).
   Judge Cary, however, also emphasized his decision is not an
unlimited ticket for FERC to pursue the debtor.

> FERC is permitted to prosecute the Massachusetts
> District Court enforcement action pursuant to 31(d) of
> the Federal Power Act which is set forth at 16 U.S.C.
> § 823b(d)(3)(B).  FERC is not entitled to pursue any
> property of the estate or any property held by Lincoln
> by virtue of this order today.  If FERC seeks such
> further relief; for example, if it wishes to pursue an
> action pursuant to section 823b(d)(5), it must, as it
> conceded at the hearing last week, seek further relief
> from stay.

*Id.* at 8.

### III. ANALYSIS

Although at the threshold, FERC maintains

(A) that the respondents waived certain of their several defenses, I do not agree and after explaining why, I will address the various contentions of the respondents in turn.

Lincoln asserted four separate arguments in its motion to dismiss:

(B) that enforcement of the FERC penalty is barred by the five-year statute of limitation provided by 28 U.S.C § 2462 ("Section 2462").

(C) that FERC's jurisdiction is limited to the regulation of wholesale electrical sales - and does not extend to programs such as the DALRP which entail or incentivize the reduction in demand or consumption of electricity.

(D) that FERC failed to provide fair and adequate notice of the conduct it deems unlawful and so runs afoul of the void for vagueness doctrine.

(E) that FERC's petition fails to plead its claim with sufficient particularity to meet the standards articulated by the Supreme Court in *Iqbal* and *Twombly*, let alone the heightened pleading standards required for fraud-based claims.

21

In their separate motion to dismiss, Mr. Silkman and CES joined in Lincoln's statute of limitations challenge and added two others of their own:

(F) that they are alleged to have engaged only in the aiding and abetting of fraud committed by other parties and that Section 222 of the FPA, 16 U.S.C. § 824v, and FERC's Anti-Manipulation Rule, 18 C.F.R. § 1c.2, do not apply to such conduct.

(G) that Mr. Silkman, as a natural person, is not an "entity" within the reach of those rules.

Moving for judgment on the pleadings, Mr. Silkman and CES joined Lincoln's challenge to FERC's jurisdiction.  However, following the Supreme Court's decision in *Electric Power Supply Ass'n*, they withdrew this contention.

### A.  *Did the Respondents Waive any of Their Defenses?*

FERC argues at the outset that the Respondents waived their statute of limitations and jurisdictional defenses by failing to raise them in the agency proceeding.  This argument raises two separate questions: first, whether issues are generally waived if not asserted in a FERC proceeding of this kind; and second, how the particular substance of these two defenses affects waiver.

1.  <u>Were the Respondents Required to Assert Their Defenses</u>
    <u>During the Agency Proceeding?</u>

The general rule is that a federal court reviewing an
agency adjudicative decision is limited to those issues
presented during the agency proceeding below.  As the Supreme
Court has explained, "[s]imple fairness to those who are engaged
in the tasks of administration, and to litigants, requires as a
general rule that courts should not topple over administrative
decisions unless the administrative body not only has erred but
has erred against objection made at the time appropriate under
its practice."  *United States* v. *L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33, 37 (1952).  If not raised at the appropriate
juncture, objections to proposed agency action are generally
waived.

Respondents claim that this "raise-or-lose" rule only
applies where the "statute or rule clearly mandates."  *Darby* v.
*Cisneros*, 509 U.S. 137, 146 (1993).  Even if this is so – and
this is not entirely obvious, as *Darby* concerns the exhaustion
of administrative *remedies* - the applicable FERC rule here
mandates that parties responding to agency action, "to the
extent practicable, . . . set forth every defense relied on."
18 C.F.R. § 385.213(c)(2).  This language is enough.  In *Upper
Blackstone Water Pollution Dist*. v. *EPA*, 690 F. 3d 9, 30 (1st

23

Cir. 2012), for example, the First Circuit found an agency rule requiring that "[a]ll persons . . . who believe any condition of a draft permit is inappropriate . . . must raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their position by the close of the public comment period" was sufficient to require objecting parties to raise their arguments during the agency proceeding or waive them.  The language in 18 C.F.R § 385.213 is as direct and clear.  FERC's rule satisfies any requirement that the raise or lose rule must be expressed explicitly.

Respondents also argue that waiver is inappropriate because the agency's decision is subject to *de novo* review, rather than more deferential review under the Administrative Procedure Act. De novo review means that a court should give "no deference" to FERC's decision and instead "make 'a fresh, independent determination of 'the matter' at stake.'"  *FERC* v. *MacDonald*, 862 F. Supp. 667, 672 (D.N.H. 1994) quoting *Doe* v. *United States*, 821 F.2d 694, 697–98 (D.C. Cir. 1987).  This standard of review is familiar from contexts other than review of agency determinations, such as appellate review of a district court's grant of summary judgment. *Rodi* v. *S. New Eng. Sch. of Law*, 532 F.3d 11, 15 (1st Cir. 2008) ("We review a district court's grant of summary judgment de novo.").  And, as is apparent from that

24

context, issues which are not raised at an appropriate time may be deemed waived by the reviewing tribunal. *See, e.g., Landrau-Romero* v. *Banco Popular De Puerto Rico*, 212 F. 3d 607, 612 (1st Cir. 2000)(holding that by failing to raise an argument at summary judgment, party has waived it); *Grenier* v. *Cyanamid Plastics, Inc.*, 70 F. 3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived.").

Although this court's *de novo* review may gain some procedural richness in the context of an action seeking enforcement of an administrative order,[5] that potential does not change the fundamental nature of this court's task — which is to "review" agency action and, as a corollary, it does not alter the basic rule that an argument may be waived by the failure to raise it at an appropriate time — such as at the time required by the agency's rules.

Accordingly, it is my belief that, as a matter of general principles and the application of the relevant FERC agency rules, defenses to a civil penalty order may be waived if a

---

[5] For instance, *de novo* review may allow for the evaluation of evidence that was not a part of the agency administrative record and may or may not require other trial-like proceedings. *See, e.g., Doe* v. *United States*, 821 F.2d 694, 697-98, 698 n. 9 & 10 (D.C. Cir. 1987).

25

party fails to raise them in response to an Order to Show Cause
issued by FERC.

The next question is whether the specific arguments at
issue here — the running of the statute of limitations and the
question of FERC's authority to oversee the DALRP — have been
waived.

2.   <u>Have The Respondents Waived Their Statute of
     Limitations Defenses?</u>

FERC contends that Respondents should have raised their
statute of limitations defense during the penalty assessment
proceeding.  Elsewhere in its briefing, however, it contends
that the statute of limitations only began to run when the right
to bring this action in federal court accrued, on September 28,
2013, after the completion of the Commission's penalty
assessment proceeding.

FERC's theory produces an absurd result; it would require
that a statute of limitations defense be raised before it had
ripened.  Fortunately, FERC's procedural rules avoid such an
absurdity by requiring only that a Respondent set forth the
defenses relied upon "to the extent practicable."  18 C.F.R. §
385.213(c)(2).  Requiring a Respondent to anticipate and raise
defenses that might only have merit at some future date and
which are dependent on various contingencies — some of which are

controlled by the agency itself — is not "practicable."
Respondents were not required to raise their statute of
limitations defense during the administrative proceeding, in
advance of the expiration of the statute of limitations, in
order to now raise the issue.

3. Have The Respondents Waived Their Jurisdictional
Defenses?

The Supreme Court, albeit in *dicta*, has on at least two
occasions suggested that objections that an agency has acted
outside of its proper jurisdictional scope may be raised during
appellate review even if not raised during an agency proceeding.
In *L.A. Tucker Truck Lines*, the Supreme Court held that a
particular argument was raised at an improperly late date, and
thus was waived.  The Court then suggested that waiver might not
be appropriate with regard to an administrative defect "which
deprives the Commission of power or jurisdiction, so that even
in the absence of timely objection its order should be set aside
as a nullity."  *Id.* at 38.  Similarly (though again in *dicta*),
in *NLRB* v. *Cheney California Lumber Co.*, the Supreme Court
explained that "if the Board has patently traveled outside the
orbit of its authority . . . there is, legally speaking, no
order to enforce."  327 U.S. 385, 388 (1946).

27

Lower courts, including the First Circuit, have applied this rule, allowing challenges to agency jurisdiction even if not raised before the agency. *N.L.R.B.* v. *Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 460 (1st Cir. 2005) ("the court of appeals retains residual jurisdiction to consider a first-time challenge to a remedy on the ground that the remedy is obviously beyond the Board's authority."). Jurisdictional challenges "raise questions that go to the very power of the Board to act and implicate fundamental separation of powers concerns," *Noel Canning* v. *NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013) aff'd *NLRB* v. *Noel Canning*, -- S. Ct. --, 2014 WL 2882090 (June 26, 2014), and their importance is only heightened where, as here, the lines between federal and state authority are also at stake. "[W]here the [agency] had no jurisdiction to enter the order, [I] have authority to invalidate the [agency's] order even though the [objecting party] did not raise its jurisdictional challenge below." *Id.* (citations and internal quotation marks omitted).[6] Because they challenge FERC's power

---

[6] FERC has cited to several cases which they contend stand for the proposition that jurisdictional challenges are waived when not properly brought before an administrative agency. Those cases, however, do not implicate the jurisdictional limits of agency power and the separation of powers issues raised here. *Burlington Northern & Santa Fe Ry.* v. *Surface Transportation Board*, 453 F.3d 473, 479 (D.C. Cir. 2006), for instance, deals with a failure to raise a statute of limitations defense.  In

to issue the order that it seeks to enforce in the present action, Respondents' jurisdictional arguments are not waived and may be reviewed by this court.

**B.    *Are FERC's Claims for Civil Penalties Barred by the Statute of Limitations?***

Both FERC and the respondents agree that the civil penalties assessed by FERC are subject to the five-year statute of limitation provided by Section 2462.  That statute provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . .

28 U.S.C. § 2462.  Where the parties differ is on how this should be applied, and more specifically, when FERC's claim accrued, triggering the running of the limitations period.

FERC contends that the accrual date is governed by the First Circuit's decision in *United States* v. *Meyer*, 808 F.2d 912 (1st Cir. 1987).  Under this approach, FERC must initiate its administrative proceeding within five years of the underlying

---

that case, the D.C. Circuit wrote: "Even a defect in the jurisdiction of an agency, however, when not timely raised before that agency is forfeit . . . unless it concerns the very composition or constitution of [that] agency." *Id.* (internal citations and quotation marks omitted).  As the quotation shows, the court recognized the unique status of challenges claiming that an agency's actions were *ultra vires*.

violation.  If that proceeding results in the assessment of a civil penalty, the agency has an additional five years in which to bring an action for enforcement of that penalty.  In other words, there are two separate sets of claims at issue here, each subject to the statute of limitations set forth in Section 2462, but accruing at different times.  The first are based upon the substantive violations allegedly occurring between July 2007 and February 2008.  Proceedings on these claims were initiated by the July 2012 Show Cause Orders and thus were timely.  The second set of claims were based upon the refusal to pay the assessed penalties in 2013 and were brought in this court that same year.

In *Meyer*, the First Circuit grounded its decision in both textual analysis of 28 U.S.C. § 2462 but also "the obvious proposition that a claim for 'enforcement' of an administrative penalty cannot possibly 'accrue' until there is a penalty to be enforced."  *Id.* at 914.  In this case, just as in *Meyer*, the cause of action for suit in federal court accrued only after the completion of the administrative proceeding.  Under 16 U.S.C. § 823b(3)(B), an action seeking "an order affirming the assessment of the civil penalty" takes place in district court "[i]f the civil penalty has not been paid within 60 calendar days after the assessment order has been made . . . ."  For the present

claims to come into existence, several preconditions had to be met.  First, FERC was required to give notice of the proposed penalty to the Respondents as required by FPA Section 31(d)(1), which FERC did in its July 17, 2012 Show Cause Orders.  Then, after the Respondents elected the procedures of FPA Section 31(d)(3), FERC was required to issue a penalty assessment order, which it did approximately one month after receiving Respondents' election.  Only sixty days after that, if the penalty remained unpaid, could FERC bring suit.  As in *Meyer*, there is no claim under this provision "until there is a penalty to be enforced."  *Meyer* governs this case, and the petitions before me were timely filed within five years of the accrual of FERC's claims.

Respondents argue both that *Meyer* is superseded and that it is distinguishable.  First, they contend that under *Gabelli* v. *SEC*, 133 S. Ct. 1216 (2013), the claims accrued at the time of the violation, no later than February 7, 2008 for both Lincoln and for Mr. Silkman and CES.  Under this approach, the statutes of limitations expired no later than February 2013.  By that date, FERC had only sent a letter to the respondents and issued Orders to Show Cause; FERC had neither issued its Civil Penalty Order nor filed its petition for affirmance of that penalty. Using that accrual date, these actions would be untimely.

31

The Respondents' invocation of *Gabelli* is based upon a somewhat facile and superficial syllogism.  *Gabelli* did not concern a case in which administrative proceedings preceded an action in federal court; there, the SEC sued directly in court.  Rather, *Gabelli* asked whether "the five-year clock begins to tick when the fraud is complete or when the fraud is discovered" and held that the fraud discovery rule does not extend to SEC actions for civil penalties.[7]  133 S. Ct. at 1219, 1222.  Respondents distort this holding by abstracting *Gabelli* into a choice between accrual at the time of the violation or at some later date.  They suggest that, therefore, this claim also must have accrued at the time of the violation rather than a later date – after the administrative proceeding – as if that were the choice before the Court in *Gabelli*.  A case about discovery rules has little bearing on this case – if any[8] – and certainly

---

[7] *Gabelli* turned substantially on the specific concerns raised by the application of the discovery rule to government enforcement proceedings, such as the difficulty in "[d]etermining when the Government, as opposed to an individual, knew or reasonably should have known of a fraud."  *Gabelli*, 133 S. Ct. at 1223.

[8] *Gabelli* also underscores the value of statutes of limitations, as a general matter, and the importance of avoiding limitations periods that stretch for long and uncertain periods, decades into the future.  133 S. Ct. at 1223 ("Chief Justice Marshall used particularly forceful language in emphasizing the importance of time limits on penalty actions, stating that it "would be utterly repugnant to the genius of our laws" if actions for penalties could 'be brought at any distance of

does not supersede *Meyer*.[9]

Respondents also argue that even if *Meyer* remains good law, the FERC process at issue here falls outside its scope.  In *Meyer*, the First Circuit contrasted the "adjudicatory administrative proceedings" required prior to suit under the Export Administration Act – after which a new five year limitations period for the suit in federal court commenced – with "prosecutorial determinations" made prior to suit.  808 F.2d 912 at 920.  Where only a prosecutorial determination is needed before bringing suit, only the original five-year limitations period, dated from the violation, applies.  Such determinations are "nothing more or less than decisions to bring suit."  *Id*.  Respondents contend that the FERC proceeding below was more akin to a prosecutorial determination.

FERC's proceeding may have been less formal and offered fewer of procedural protections than some adjudications under

---

time.' *Adams* v. *Woods*, 2 Cranch 336, 342, 2 L.Ed. 297 (1805).").  The *Meyer* rule, however, furthers these aims, providing a fixed (if additional) limitations period – and moreover, doing so in a context where the subjects of agency action are on heightened notice of their liability.  Even at the highest levels of abstraction, *Gabelli* is entirely consistent with *Meyer*.

[9] Indeed, *Meyer* sits on one side of a circuit split, yet the *Gabelli* court did not purport to address or resolve that split.  *See Fed. Energy Regulatory Comm'n* v. *Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1131 (E.D. Cal. 2015).  Nothing in *Gabelli* suggests that it is inconsistent or incompatible with *Meyer*.

the APA – or even the adjudication in *Meyer* – but it was
significantly more than a prosecutorial determination.  The
Commission made extensive findings of facts and applied the law
to those facts.  It did not merely suggest penalties to be
sought later; it ordered Respondents to pay those penalties to
the United States Treasury.  That the statutory scheme makes the
Commission's determinations only the first step in a legal
process does not strip those determinations of their content and
shrink them into the equivalent of a "charging letter."  *Id.*
FERC did more than decide to bring suit.  It conducted an
adjudication.

Respondents place some weight upon *FEC* v. *Nat. Republican
Senatorial Comm.*, 877 F.Supp. 15 (D.D.C. 1995) for the
proposition that an administrative process which lacks "elements
common to adversarial adjudication" such as the right to a
hearing and the opportunity to question witnesses is not an
adjudication within the meaning of *Meyer*.  The administrative
proceeding at issue in this case, though, is a far cry from that
at issue in *Nat. Republican Senatorial Comm.*  The FEC's process,
for example, did not lead to any finding of liability, unlike
the FERC proceeding here.  *Id.* at 19.  In that case, the
agency's role was only to "investigate . . . to conciliate . . .
and to determine whether or not to bring a civil enforcement

action."  The court described the process as one which
"essentially formalizes the usual steps involved in preparing a
civil suit: gathering evidence, determining whether sufficient
evidence exists, and attempting to work with the potential
defendant to obviate the need for litigation."  *Id*. at 18, 20.
While the procedures used by an agency clearly can help
distinguish between adjudications and decisions to prosecute,
*Nat. Republican Senatorial Comm*. does not suggest that the more
robust FERC proceeding here was not an adjudication.  *See also*
*FERC* v. *Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1133 (E.D. Cal.
2015) (finding FERC penalty assessment proceeding did not
"lack[] the basic elements common to adversarial adjudication.")

    FERC could not have brought this action without first
completing its adjudication.  "[T]he necessity for allowing an
administrative proceeding to run its course as a precondition to
the commencement of suit" is the "key ingredient" that the
present circumstances share with *Meyer*.  By initiating formal
proceedings within five years of the alleged violation, FERC
complied with Section 2462.  After those proceedings reached
their conclusions, FERC's claims for the enforcement of civil
penalties in federal court ripened.  FERC then had five years

within which to bring those enforcement actions.  FERC's

petitions for enforcement are timely.[10]

## C.   *Does FERC Have Jurisdiction Over Respondents' Alleged Violations?*

Respondents have at various points during this litigation

challenged FERC's power to enact – and therefore enforce –

"demand response" programs such as the DALRP on jurisdictional

grounds.  While Respondents Mr. Silkman and CES have withdrawn

their jurisdictional arguments in light of the Supreme Court's

recent decision in *F.E.R.C.* v. *Elec. Power Supply Ass'n*, No. 14-

840, 2016 WL 280888 (U.S. Jan. 25, 2016) – although Lincoln did

not do so, no doubt, because it believed it was subject to the

---

[10] Following the hearing on this motion to dismiss, Lincoln
submitted *SEC* v. *Graham*, 2014 U.S. Dist. LEXIS 64953 (S.D. Fla.
May 12, 2014), as further authority which it contends supports
their reading of Section 2462.  I believe that case is
consistent with and supports the reading that I have laid out
above.  As the *Graham* decision explains "the latest point at
which a claim may accrue is the date on which the last act
giving rise to the plaintiff's 'complete and present cause of
action' occurs" and "the Government must commence the cause of
action within five years of the last act giving rise to the
claim." *Id.* at *7.  In *Graham*, as in *Gabelli*, the Government
failed to initiate any formal enforcement proceedings — either
in federal court or before the agency — within the five year
window following the defendants' misconduct and so the claims
were barred.  Here, in contrast, as in *Meyer*, the completion of
the agency proceeding and the failure to pay within sixty
days of the civil penalty order was the "last act giving rise to the
plaintiff's 'complete and present cause of action.'"
Accordingly, the Government had five more years after that to
bring a suit before this court to enforce that order.

automatic bankruptcy litigation stay – I briefly address these arguments for the sake of clarity.

FERC has jurisdiction over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce," but not over "any other sale of electric energy." 16 U.S.C. § 824(b)(1). Respondents asserted – and the D.C. Circuit held – that FERC's demand response programs extend beyond that jurisdiction and are *ultra vires*. Wrote the D.C. Circuit, "[b]ecause FERC's rule entails direct regulation of the retail market — a matter exclusively within state control — it exceeds the Commission's authority." *Elec. Power Supply Ass'n* v. *F.E.R.C.*, 753 F.3d 216, 224 (D.C. Cir. 2014).

The Supreme Court, however, this term reversed the D.C. Circuit and held that FERC's demand response programs are within its authority. *F.E.R.C.* v. *Elec. Power Supply Ass'n*, No. 14-840, 2016 WL 280888, at *5. The Court described FERC's demand response programs as "address[ing] – and address[ing] only – transactions occurring on the wholesale market. *Id.* at *14. While the retail and wholesale markets in electricity, as in any sector, are inextricably linked – and demand response therefore affects retail markets - the Court found demand response programs to be unambiguously targeted at and operating through

37

the wholesale electricity markets within FERC's jurisdiction.[11] "When FERC regulates what takes place on the wholesale market, as part of carrying out its charge to improve how that market runs, then no matter the effect on retail rates, § 824(b) imposes no bar." *Id.* The Court further found the purposes of the demand response program to be aimed at protecting the reliability and economic efficiency of the wholesale market, precisely as FERC was created to do. *Id.* at *17. Indeed, *only* FERC, and not the states, could create this sort of demand response program – it has not just the authority but the sole authority to do so. *Id.* at *19.

As at least one Respondent has recognized, the Supreme Court's holding resolves any questions about FERC's authority to operate demand response programs, including the DALRP.[12] The

---

[11] Unlike Judge Edwards' dissent in the D.C. Circuit, the Supreme Court did not reach its conclusion through a grant of *Chevron* deference; rather, it found FERC's authority "clear." F.E.R.C. v. Elec. Power Supply Ass'n, No. 14-840, 2016 WL 280888, at *12 n.5 (U.S. Jan. 25, 2016). FERC has offered its own interpretation of its jurisdiction, *See Demand Response Compensation in Organized Wholesale Energy Markets*, 134 FERC ¶ 61,187, 2011 WL 890975 at ¶ 112-15 (Mar. 15, 2011), but given the Supreme Court's decision, that interpretation is immaterial here.

[12] FERC claimed jurisdiction not only under 16 U.S.C. § 824(b)(1) but also under 16 U.S.C § 824v, which prohibits energy market manipulation. Both because the jurisdictional issues in this case have been withdrawn and because jurisdiction is clear under § 824(b)(1), I need not address whether § 824v would independently grant or expand jurisdiction.

Court made this abundantly clear, noting the lack of "any conceivable doubt as to [the demand response Rule's] compliance with § 824(b)'s allocation of federal and state authority" and observing that "any last flicker of life" in the arguments against FERC's jurisdiction had been extinguished. *Id.* at *17, *19. No jurisdictional challenge against this demand response-related enforcement action is available.

**D.    *Did FERC Fail to Provide Fair Notice of What Conduct it Deemed Unlawful?***

The First Circuit has explained that:

> The "void for vagueness doctrine" addresses at least
> two discrete due process concerns: "first, ...
> regulated parties should know what is required of them
> so they may act accordingly; second, precision and
> guidance are necessary so that those enforcing the law
> do not act in an arbitrary or discriminatory way."

*U.S.* v. *Zhen Zhou Wu*, 711 F.3d 1, 13 (1st Cir. 2013) quoting *FCC* v. *Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012). *See also Love* v. *Butler*, 952 F.2d 10, 14 (1st Cir. 1991) (The statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

The doctrine has a somewhat more limited scope and application in the present context for two reasons. First, any potential vagueness is balanced by the scienter requirement

necessary to find a violation of FPA Section 222 and the Anti-Manipulation Rule.  *See Zhen Zhou Wu*, 711 F.3d at 15 ("Where a statute 'explicit[ly] provi[des] that a criminal violation of its terms must be "willful,"' the void-for-vagueness doctrine is especially inapposite."), *quoting United Union of Roofers, Waterproofers & Allied Workers* v. *Meese*, 823 F.2d 652, 659 (1st Cir. 1987).  Second, the doctrine is applied more leniently in the sphere of economic regulation of sophisticated parties.  *See U.S.* v. *Lachman*, 387 F.3d 42, 56-57 (1st Cir. 2004) ("The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague . . . This is particularly the case where, as here, the statute deals with economic regulation and is addressed to sophisticated businessmen and corporations . . . .").  Both of these counterweights to vagueness are strengthened where there is a process for parties "to obtain an official government answer . . . before they engage in potentially unlawful conduct."  *Zhen Zhou Wu*, 711 F.3d at 15.  The opportunity to receive guidance provides additional protection against a vaguely worded regulation unfairly "trapping an unwary" person.  *Id.*

    In addition, when applying the void-for-vagueness doctrine outside of the First Amendment context, the relevant inquiry is whether "whether a statute is vague as applied to the particular

facts at issue," for a defendant "who engages in some conduct
that is clearly proscribed cannot complain of the vagueness of
the law as applied to the conduct of others." *Holder* v.
*Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)(internal
citations and quotation marks omitted).

Lincoln argues that FERC failed to provide sufficient - or
any — guidance to DALRP participants regarding how to set their
"baseline" energy consumption levels and instead seeks to
penalize the Respondents based upon an interpretation of
baseline setting rules that was first announced during the
investigations leading to these enforcement actions.  Lincoln
further claims that it believed that by operating its on-site
generator it was providing on-going demand response and that the
DALRP was an incentive for it to continue doing so.

1.   The Applicable Statute and Regulation

FPA Section 222 makes it unlawful:

> for any entity . . . directly or indirectly, to use or
> employ, in connection with the purchase or sale of
> electric energy or the purchase or sale of
> transmission services subject to the jurisdiction of
> the Commission, any manipulative or deceptive device
> or contrivance (as those terms are used in section
> 78j(b) of title 15), in contravention of such rules
> and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for
> the protection of electric ratepayers.

18 U.S.C. § 824v.  FERC's Anti-Manipulation Rule, promulgated

pursuant to Section 222, makes it unlawful:

> for any entity, directly or indirectly, in connection
> with the purchase or sale of electric energy or the
> purchase or sale of transmission services subject to
> the jurisdiction of the Commission, (1) To use or
> employ any device, scheme, or artifice to defraud, (2)
> To make any untrue statement of a material fact or to
> omit to state a material fact necessary in order to
> make the statements made, in the light of the
> circumstances under which they were made, not
> misleading, or (3) To engage in any act, practice, or
> course of business that operates or would operate as a
> fraud or deceit upon any entity.

18 C.F.R. § 1c.2.

2.   Guidance Regarding the DALRP

Neither the ISO-New England Load Response Manual nor the

relevant ISO-NE/FERC Electric Tariff directly set forth how a

participant should conduct its operations during the period in

which the baseline is set.[13]

ISO-NE has, however, provided some guidance in its Tariff,

which explains that:

> Load Response Program incentives are available to any
> Market Participant or Non-Market Participant which,
> consistent with the requirements set forth herein,
> enrolls itself and/or one or more retail customers
> ("Demand Resources") to provide a reduction in their

---

[13] ISO-NE has defined "customer baseline" as "for purposes of the
ISO New England Load Response Program Manual, the average
aggregate hourly load, rounded to the nearest kWh, for each of
the 24 hours in a day for each Individual Customer."  ISO New
England Inc., FERC Electric Tariff No. 3, February 15, 2007, §
III.1.

electricity consumption in the New England Control
Area during peak demand periods.

ISO New England Inc., FERC Electric Tariff No. 3, September 1,
2006, § III.E.1.  That document also explains that: "The [DALRP]
is not intended to pay for load reductions that would have been
scheduled in any event, such as facility shut-downs."  *Id.* at §
III.E.2.

Lincoln also received somewhat more specific guidance from
its enrolling agent, Constellation New Energy, in a letter dated
January 23, 2008 (that is, during the period Lincoln was an
active DALRP participant).  That letter explained that
Constellation had observed data "rais[ing] concerns that
customers may be modifying energy usage in a manner that is
inconsistent with the purpose and intent of the [DALRP] and the
rules set forth in the ISO New England Load Response Manual."
The letter continued:

> Specifically, we are concerned that some of our Day-
> Ahead program customers may have increased their usage
> while ISO-NE was determining their baselines, possibly
> due to changed production schedules *or on-site
> generation outages*.  If baseline usage is "inflated"
> in this manner, bids into the Day-Ahead program may
> reflect a customer's normal usage rather than
> dispatchable load that the ISO-NE can depend on for
> reliability purposes.
> . . .
> If you have concerns that you may be acting violations
> of rules, but are unsure, please contact us and we
> will be happy to coordinate discussions with ISO-NE
> about whether your current actions are permissible.

43

According to FERC's allegations, Lincoln did not respond to this letter, alter its conduct in response to this warning, or contact Constellation regarding the lawfulness of its conduct.

3.   Was This Information Sufficient To Provide Notice to Lincoln That Its Conduct Was Prohibited?

The Anti-Manipulation Rule prohibits fraud.  The Rule is therefore not void for vagueness if, given the information available to it, Lincoln should have been aware that its conduct — reducing the usage of its on-site generator to below normal levels so as to create a DALRP baseline energy consumption level above normal operating conditions — could be deemed fraudulent. Fraud can be briefly defined as "the knowing misrepresentation of the truth or the concealment of a material fact to induce another to act to his or her detriment."  Black's Law Dictionary 924 (9th ed. 2009).  Here the alleged material misstatements concerned the manner in which Lincoln set its baseline level for DALRP participation.  FERC alleges that Lincoln misrepresented the energy demands from its ongoing operations in order to receive DALRP payments.

Although it had not expressly stated how a baseline should be set, ISO-NE had explained that the purpose of demand response programs are "to provide a reduction in their electricity consumption in the New England Control Area during peak demand

periods" and that, accordingly, "[t]he [DALRP] is not intended to pay for load reductions that would have been scheduled in any event, such as facility shut-downs."  As alleged, Lincoln ran its on-site generator during its DALRP participation just as it had before participating in DALRP, with the exception of the baseline period.  The "reductions" in load drawn from the grid, therefore, were simply a reversion to what Lincoln would have done in the absence of the DALRP altogether: they would have occurred "in any event" and so are not the sort of reductions that DALRP is intended to pay for.  Lincoln's conduct — and its receipt of DALRP funds — was directly contrary to the intended purpose of the DALRP — a purpose which had been expressed to program participants.  *Cf. Holloway* v. *United States*, 526 U.S. 1, 9 (1999)(rejecting a proposed statutory construction that "would exclude from the coverage of the statute most of the conduct that Congress obviously intended to prohibit").  Lincoln misrepresented its typical operations during the baseline setting period so as to provide the false impression that it was providing demand response reductions in electricity consumption during the period of its participation in the DALRP.  Based upon these misrepresentations and the false impression they conveyed to ISO-NE, Lincoln received substantial incentive payments.

That this conduct was understood by participants to be improper is made manifest by the letter from Constellation to Lincoln, which condemns the precise conduct in which Lincoln engaged: inflating a baseline through outages of on-site generation during the baseline setting period.  Though not official guidance, this letter implicates three separate, though related, features of the void-for-vagueness doctrine, each cutting against any due process violation here.  First, the letter shows why regulations addressed to "businessmen and corporations which, because of the complexity of the regulatory regime, necessarily consult counsel in planning their activities," can be less clear without violating due process. *Lachman,* 387 F.3d at 57.  As this letter demonstrates, the availability of professional guidance to a sophisticated corporation that has intentionally enrolled itself in a government regulatory program acts as a safety valve, mitigating the risk of potentially harsh consequences for the unwary.  Even if Lincoln could not infer that its actions were specifically contrary to the clearly expressed purpose of DALRP, Constellation could explain it to Lincoln.

The letter also provides evidence that Lincoln was not, in fact, unwary.  Rather, it was informed that the conduct was unlawful — and given an invitation to receive further guidance

46

from either Constellation or ISO-NE.  As described above, the scienter requirement of a prohibition on fraud vitiates void-for-vagueness concerns by requiring not only that a party engage in fraudulent conduct, but do so knowing its conduct was improper.  Here, the allegations are that this is precisely what occurred — that Lincoln intentionally misrepresented its typical operations while enrolling in DALRP, and willfully persisted in this conduct even after receiving a letter from its regulatory liaison expressing concerns.

Third, the letter shows that Lincoln had the opportunity to seek an official opinion on the permissibility of its DALRP participation and baseline setting.  It declined to avail itself of that opportunity – perhaps because it had the scienter that its acts were fraudulent – but in any case, was given the chance to clarify its obligations.  For each of these reasons, "the void-for-vagueness doctrine is especially inapposite" as applied to Lincoln.  *Zhen Zhen Wu,* 711 F.3d at 15.

As in any regulatory or statutory scheme, there is inevitably some tension between providing precise guidance and preserving the flexibility to address the often ingenious imaginations of those who would seek to evade regulatory strictures and take advantage of perceived loopholes.  *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128,

151 (1972)(prohibition on fraud should be read "not technically and restrictively, but flexibly to effectuate its remedial purposes."). Here, the relevant statute prohibits "fraud" in connection with a jurisdictional transaction. Although it is perhaps true that this regulation does not provide a precise delineation of where the outer boundaries of prohibited conduct lays, that is not the test it must meet. Lincoln knew or should have known that its conduct was proscribed. I find no due process violation here.

**E.    *Did FERC Plead Its Claim with Sufficient Particularity?***

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." To satisfy Rule 9(b) pleading requirements, the "complaint must specify the time, place, and content of an alleged false representation." *U.S. ex rel. Heineman-Guta* v. *Guidant Corp.*, 718 F. 3d 28, 34 (1st Cir. 2013) (internal citations and quotation marks omitted). Generally, FERC alleges the scheme that it believes to be fraudulent in detail. It provides the detailed timeline and factual allegations that normally are at issue in a challenge to the particularity of a pleading.

Lincoln contends that this is insufficient because FERC failed to plead its claims with sufficient particularity in

three respects.  First, Lincoln claims that FERC failed to adequately plead a "scheme to defraud."  Second, Lincoln claims that FERC failed to adequately plead that Lincoln acted with scienter.  Third, Lincoln claims that FERC failed to adequately plead that Lincoln's conduct was in connection with a transaction within FERC's jurisdiction.  These arguments are, in substance, recapitulations of the arguments discussed in the previous sections dealing with the jurisdictional and fair notice challenges.  *See supra* Sections III(B)-(C).

Lincoln contends that FERC has failed to allege "that entities in Lincoln's position received any guidance whatsoever from FERC, ISO-NE or Constellation on how to set their baselines. Thus, FERC's description of the DALRP rules represents only its conclusions on how a baseline should have been established."  This is best understood not as a challenge to the level of detail in the pleadings but a rearticulation of the same challenge discussed, and rejected, above:  that FERC failed to provide sufficient notice to Lincoln (and similarly situated entities) about what conduct FERC deemed unlawful.

Similarly, Lincoln contends that FERC failed to adequately plead facts giving rise to an inference of scienter.  Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n. 12

(1976).  To support an inference of scienter, FERC has alleged that Lincoln intentionally curtailed its use of the generation only during the baseline-setting period so as to inflate the baseline.  It alleges that Lincoln's behavior during the baseline-setting period would have been economically irrational but for the opportunity to receive DALRP participation payments, strengthening the inference of scienter.  Furthermore, FERC claims that Lincoln engaged in a strategic pattern of bidding into the DALRP in order to maintain that inflated baseline. Finally, FERC claims that Lincoln was informed by its agent, Constellation, that there were irregularities in the manner of its DALRP-participation.  Lincoln argues that these allegations are insufficient because they do not show "that Lincoln knew at the time it set its baseline that curtailing the Westinghouse was improper . . . ."  This again is an attack on the notice provided to Lincoln regarding what conduct was prohibited when entities participated in the DALRP, not on the particularity of the allegations.

Finally, Lincoln claims that while FERC has concluded that Lincoln's scheme and the DALRP are within its jurisdiction, "FERC has not alleged any facts supporting its conclusions, nor identified any FERC-jurisdictional transactions that Lincoln's conduct may have affected.  Nor could it, given that the

Complaint addresses retail non-purchases by Lincoln that are not within FERC's jurisdiction."  Lincoln does not suggest that the transactions at issue are thinly described but only that those transactions fall outside of FERC's regulatory jurisdiction.  In each of these three instances, I find FERC's allegations sufficiently particularized to satisfy Rule 9(b) muster; to the extent they recite substantive challenges, those are dealt with in my discussion above.

**F.   Are Respondents Non-Liable as Aiders and Abetters of the Primary Violation?**

Respondents CES and Mr. Silkman contend that they cannot be held liable for manipulation of the energy markets because they at most aided and abetted the actions of Rumford; aiding and abetting fraud, they argue, is not made liable by FPA Section 222 and the Anti-Manipulation Rule.

I agree that a party that only aided and abetted the manipulations of another is not subject to liability.  The Supreme Court has interpreted § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 such that those rules reach only primary violators of the securities laws, but do not reach those who engage only in aiding and abetting.  FPA Section 222 and the Anti-Manipulation Rule have been lifted *in haec verba* from those securities laws.  Where lawmakers have borrowed identical

language from one statutory scheme, they are presumed to have
borrowed the judicial interpretations of that language as well.
*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S.
71, 85-86 (2006) ("when 'judicial interpretations have settled
the meaning of an existing statutory provision, repetition of
the same language in a new statute indicates, as a general
matter, the intent to incorporate its . . . judicial
interpretations as well.'" quoting *Bragdon* v. *Abbott*, 524 U.S.
624, 645 (1998)).  Like the securities laws on which they are
modeled, FPA Section 222 and the Anti-Manipulation Rule "do[]
not in terms mention aiding and abetting."  *Central Bank of
Denver N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S.
164, 175 (1994).  Thus, in enacting FPA Section 222 and the
Anti-Manipulation Rule, Congress and FERC can be presumed to
have limited the reach of those provisions to primary
violators.[14]

---

[14] FPA Section 222 was enacted in 2005, after the Supreme Court's
decision in *Central Bank of Denver, N.A.* v. *First Interstate
Bank of Denver, N.A.*, 511 U.S. 164 (1994), but before that
court's decisions in *Stoneridge Investment Partners, LLC* v.
*Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) and *Janus Capital
Group, Inc.* v. *First Derivative Traders*, 131 S. Ct. 2296 (2011).
I take Congress to have incorporated at least the decision in
*Central Bank of Denver* and do not need to decide whether
Congress intended the FPA to track later interpretations of the
securities laws.

Nothing particular to the energy markets or to this statutory scheme warrants a departure from this rule. The "directly or indirectly" language in both the statute and the rule provides no further support for FERC's position. The Supreme Court addressed this language in the course of its *Central Bank* decision and found that it does not expand the reach of a statutory liability scheme beyond primary violators. "The problem, of course, is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Id.* at 176.

FERC also attempts to limit the decision in *Central Bank* to cover only private rights of action. Neither that decision, nor the statutory text, contains any indication that the principle is so limited. Rather, the subsequent legislative history bears out a contrary story. After the Supreme Court's decision in *Central Bank*, Congress enacted a law which allowed the SEC, but not private parties, to pursue aiders and abettors of securities frauds. *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 158 (2008). As these subsequent events demonstrate, *Central Bank* was not limited to private actions – Congress stepped in to undo its effect for *government* suits.

Moreover, when Congress intends to impose liability on those who aid and abet fraud, it has the tools to do so explicitly. *See* 15 U.S.C §78t(e).

Finally, FERC's invocation of the general principle that laws designed to curb fraud-based activity should be applied with some flexibility, so as to keep pace with the ingenuity of would-be fraudsters, provides no succor. It is, of course, important that anti-fraud legislation be interpreted and applied with flexibility "to deal with new manipulative or cunning devices." *Ernst & Ernst*, 425 U.S. 185, 203. But as *Central Bank* makes clear, while flexibility exists to allow coverage of novel frauds, it does not extend to those who only aid fraudulent schemes — whether original or trite. As in the context of securities fraud, the textual language must be primary when interpreting the FERC rules. *See Central Bank of Denver,* 511 U.S. at 173 ("With respect, however, to the first issue, the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."). That language limits liability to primary violators.

Even so, CES and Mr. Silkman may be primary violators in their own right, even if they also were aiders and abetters of fraud. *Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*, 552 U.S.

148, 166, (2008) ("secondary actors who commit primary violations" are liable for their primary violations).

Most of the allegations, which I take as true at this stage, suggest that CES and Silkman acted in the role of consultants and advisors to Rumford. *See, e.g.,* Silkman Compl. ¶¶ 35, 36 (describing CES and Silkman as "consultants" providing services to Rumford). FERC suggests that they hatched the scheme and presented it to Rumford to be executed by the latter. *See, e.g.*, Silkman Compl. ¶¶ 40, 42, 44. Such allegations are an insufficient basis for imposing primary liability. It is not enough that an entity assisted or provided advice to another company in support of the latter's execution of a fraudulent scheme.

In *Stoneridge*, for instance, the Supreme Court found that liability could not be imposed upon a defendant who engaged in transactions, either recklessly or knowingly, that enabled another party to publish and disseminate fraudulent financial statements. *See Stoneridge*, 552 U.S. at 153-57. In that case, the plaintiff argued, much as here, that "respondents engaged in conduct with the purpose and effect of creating a false appearance of material fact to further a scheme to misrepresent [a third party's] revenue." *Id.* at 160. Responding to this argument, the court explained that "[n]o member of the investing

public had knowledge, either actual or presumed, of respondents'
deceptive acts during the relevant times.  Petitioner, as a
result, cannot show reliance upon any of respondents' actions
except in an indirect chain that we find too remote for
liability." *Id.* at 159.  The corollary here is that where a
party only devises a scheme to defraud ISO-NE and assists
another in executing it, it is that other party who is actually
perpetrating a fraud against ISO-NE (and upon whom ISO-NE might
rely).  The assisting party is only an aider and abettor beyond
the reach the statutory scheme.

But aiding and abetting a fraudulent scheme does not
somehow excuse participation in the actual execution of a
fraudulent scheme.  And there are allegations that CES and Mr.
Silkman did precisely that.  According to FERC, "CES (including
Silkman and other employees) . . . communicated daily to ISO-NE
Rumford's availability to provide approximately 20 MW of
electricity 'reduction.'"  Silkman Compl. ¶ 45.  These bids were
necessary both to receive payments from ISO-NE and to freeze the
baseline at the allegedly inflated level.  The Petition also
alleges that CES submitted registration information to ISO-NE
that fraudulently represented Rumford's load reduction capacity.
*See id.* at ¶ 67.  FERC alleges that CES and Mr. Silkman did not
merely advise Rumford how to execute a fraudulent scheme — they

perpetrated it themselves by providing allegedly false statements to ISO-NE regarding their client's participation in DALRP.  These allegations would render them direct violators of FPA Section 222 and not merely aiders and abettors of another's primary violation.

## G.   *Does Section 222 Apply to Individuals?*

By its terms, FPA Section 222 applies only to "entities." Mr. Silkman claims that he, as a natural person, is not an entity subject to Section 222 or the Anti-Manipulation Rule.

The proper interpretation of "entity" in FPA § 222 was recently addressed – seemingly for the first time – in *FERC* v. *Barclays Bank PLC*, 105 F. Supp. 3d 1121 (E.D. Cal. 2015). There, as here, the defendants urged that "entity" excluded natural persons based on both dictionary definitions of the term and other uses of the word "entity" in the Energy Policy Act of 2005.  The *Barclays* court, however, found that "entity" was meant to include natural persons.  It noted that other enforcement provisions enacted concurrently with FPA § 222 used "entity" and "person" interchangeably.  FPA § 221, 16 U.S.C. § 824u (No *entity* shall willfully and knowingly report any information relating to the price of electricity sold at wholesale or the availability of transmission capacity, which information *the person* or any other entity knew to be false . .

57

." (emphasis added).  The court also noted that the provisions of the statute under which FERC assessed penalties allow penalties against "[a]ny person," which indicates that Congress's statutory scheme envisaged enforcement against natural persons.  Finally, the court reiterated that FPA § 222 was modeled after Section 10(b) of the Securities Exchange Act, which indisputably allows for actions against individuals.  The court declined to afford FERC *Chevron* deference for its own interpretation of "entity," which likewise includes persons, but did not explain its reason for denying deference.

If called upon to interpret the statute directly, I would likely reach the same conclusion as the *Barclays* court, though only with some difficulty.  Standing alone, the word "entity" is ambiguous as to whether it includes individuals.  The parties have turned to their respective dictionaries and offer competing definitions of entities to suit their purposes.  I know of no canon of interpretation which allows me to choose between one dictionary's definition of entity which excludes a natural person, *see* Black's Law Dictionary 612 (9th ed. 2009), and another which includes them, *see* American Heritage Dictionary (5th ed. 2011).[15]  Read together with the structural features of

---

[15] Mr. Silkman cites *Samantar* v. *Yousuf*, 560 U.S. 305, 315 (2010) as support for his preferred definition.  In that case, however,

the FPA identified by the *Barclays* court, the term "entity" in this statutory context appears best read to include individuals. The Congressional patterning of § 222 on the securities laws is also suggestive of an intent to cover natural persons, although I note that Section 10(b) refers to "persons" rather than "entities," complicating any effort to draw a clear comparison in this regard.  I could find the shift from "person" to "entity" illustrative of a Congressional intent to exclude natural persons from liability under FPA § 222, or I could see the change as a necessary translation from one statutory scheme to another with the intent of keeping the underlying meaning and effect (indeed, it would be an odd rule that outlaws corporate fraud, but exculpates individuals who engage in the same act). Nevertheless, I need not resolve these complicated interpretive matters, for I do not interpret the statute in a vacuum. Rather, I must pay deference to the agency's interpretation.

---

after citing a dictionary definition, the Supreme Court continued to analyze the full text and purpose of the statute before concluding that "entity" excluded "persons" within that context.  The resort to other tools of interpretation shows that *Samantar* interpreted the term "entity" in the Foreign Sovereign Immunities Act, not across the whole United States Code. *Compare City of Abilene, Tex*. v. *F.C.C.*, 164 F.3d 49, 52 (D.C. Cir. 1999) ("All we know is that "entity" is a term Congress left undefined in the Telecommunications Act.4 The term may include a natural person, a corporation, a partnership, a limited liability company, a limited liability partnership, a trust, an estate, an association.").

FERC has interpreted the term "any entity" in section 222 to include natural persons.  This interpretation was made in the process of promulgating the Anti-Manipulation Rule, although it was not published along with that Rule in the Code of Federal Regulations.  During the notice-and-comment period for the Anti-Manipulation Rule, FERC received comments regarding the scope of the term "any entity" in Section 222.  In response to these comments, FERC determined that it would interpret "'any entity'" to include any person or form of organization, regardless of its legal status, function or activities."  Order 670 at ¶ 18.  This interpretation was labelled a "Commission Determination" and was included in FERC Order 670, itself labelled a "Final Rule."  The Commission noted that it found it "unnecessary to change the wording of the proposed regulatory text" in response to most of the comments it had received, but would issue clarifications to commenters in the Order instead.  Order 670 at ¶ 4.

The *Chevron* deference framework governs statutory interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States* v. *Mead Corp.*, 533 U.S. 218, 226-27 (2001).  Here,

Congress explicitly granted FERC with rule-making authority in Section 222, satisfying the first half of the *Mead* test.

This interpretation was also promulgated "in the exercise" of that rulemaking authority.  To be sure, the agency's interpretation was not part of the regulatory text and did not itself go through notice-and-comment rulemaking, as in the paradigmatic case of an interpretation owed deference.  *Id.* at 230.  But it was put forward as part of the notice-and-comment process, in precisely the same Commission order as the text itself.  This interpretation was made "in the exercise" of notice-and-comment rulemaking; indeed, agency responses to comments are essential features of the notice-and-comment process.  Moreover, even interpretations made through processes less formal than notice-and-comment rulemaking may be owed *Chevron* deference.  *See Mead*, 533 U.S. at 231; *Barnhart* v. *Walton*, 535 U.S. 212, 221 (2002).  The officially designated "Commission Determinations" in Order 670 were made through a "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement" with the force of law.  *Mead*, 535 U.S. at 230. *Chevron* governs the interpretation of this provision.[16]

_____

[16] Although under *Mead*, this interpretation clearly must be analyzed through the lens of *Chevron* deference, the Supreme

I have already noted the ambiguities present in the interpretation of the word "entity," including competing dictionary definitions and competing inferences from a comparison to securities law.  I have also indicated that I find FERC's interpretation reasonable – indeed, it is the interpretation to which I would be inclined if I, rather than the agency, had been tasked with resolving the question.  Under *Chevron*, I must accept the reasonable interpretation of an ambiguous provision by the agency delegated authority to make that interpretation.  Accordingly, Mr. Silkman is not exculpated from liability under FPA § 222 by virtue of being a natural person.

---

Court has identified additional factors that can help determine the applicability of *Chevron*. These include "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Barnhart* v. *Walton*, 535 U.S. 212, 222 (2002). Were these factors to come into play here, they would only bolster the conclusion that *Chevron* covers this interpretation. FERC is the expert administrator of this statute, which regulates complex energy markets, and has been delegated authority to fill in interstitial interpretive matters in order to achieve the important goal of safeguarding the orderly and fair operation of those markets.

## IV. CONCLUSION

For the reasons set forth above, the Motion to Dismiss filed by Lincoln (Case No. 13-13056, Dkt. No. 19), the Motion to Dismiss filed by CES and Mr. Silkman (Case No. 13-13054, Dkt. No. 8), and the Motion for Judgment on the Pleadings filed by CES and Mr. Silkman (Case No. 13-13054, Dkt. No. 35) are hereby DENIED.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE